1  CRAIG G. MARGULIES (State Bar No. 185925)
2  MONSI MORALES (State Bar No. 235520)
   **MARGULIES FAITH, LLP**
3  16030 Ventura Boulevard, Suite 470
   Encino, CA 91436
4  Telephone: (818) 705-2777
   Facsimile:  (818) 705-3777
5  Email:  Craig@MarguliesFaithLaw.com
   Email:  Monsi@MarguliesFaithLaw.com
6
7  Attorneys for Creditor/Plaintiff Darren Kessler

8
9              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
10              **SAN FERNANDO VALLEY DIVISION**

11
   In re                              Case No. 1:19-bk-11696-VK
12
   PETER M. SELTZER,                  Chapter 7
13
                          Debtor.     Adv. No.: 1:19-ap-01151-VK
14
   ─────────────────────────────     **MOTION FOR SUMMARY JUDGMENT**
15 DARREN KESSLER, an individual,     **AGAINST DEFENDANT PETER M.**
                                      **SELTZER DENYING DEBTOR'S**
16                        Plaintiff,  **DISCHARGE UNDER 11 U.S.C. §**
                                      **727(a)(2)(A), (a)(4)(A), AND (a)(5), OR,**
17 vs.                                **IN THE ALTERNATIVE, FOR SUMMARY**
                                      **ADJUDICATION; MEMORANDUM OF**
18 PETER M. SELTZER, an individual    **POINTS AND AUTHORITIES IN**
                                      **SUPPORT OF MOTION**
19                        Defendant.
                                      [Plaintiff's Separate Statements of
20                                    Uncontroverted Facts and Conclusions of
                                      Law, Request for Judicial Notice,
21                                    Declaration in Support Thereof, and
                                      Proposed Summary Judgment Filed and
22                                    Lodged Concurrently herewith]

23                                    **Hearing:**
                                      Date:    November 18, 2020
24                                    Time:    2:30 p.m.
                                      Place:   Courtroom 301
25                                             United States Bankruptcy Court
                                               21041 Burbank Blvd.
26                                             Woodland Hills, CA  91367

27
28

**TABLE OF CONTENTS** Page

I.   **INTRODUCTION** ................................................................................................2

II.  **STATEMENT OF MATERIAL UNDISPUTED FACTS** ................................3

    A.  **The Parties** ...........................................................................................3

    B.  **Defendant's Original Schedules and Statement of Financial Affairs**...........3

    C.  **Intial Chapter 11 §341(a) Meeting of Creditors** .................................4

    D.  **Debtor's Amended Schedules**................................................................7

    E.  **The Monthly Operating Reports**............................................................9

    F.  **Additional Assets and Transfers Discovered by Plaintiff**............................9

    G.  **The 727 Complaint** .............................................................................16

III. **LEGAL STANDARD** .........................................................................................16

    A.  **Jurisdiction In This Court Is Proper** ...................................................16

    B.  **The Standard For Summary Judgment Or Summary Adjudication** ............17

IV.  **ARGUMENT**........................................................................................................18

    A.  **There Is No Genuine Issue of Material Fact that Defendant Transferred and Concealed Property in the Year Preceding the Bankruptcy Filing such that He Should be Denied a Discharge Under 11 U.S.C. § 727(a)(2)(A)**..............18

        1.  **Disposition and Concealment of Property**................................19

        2.  **Intent to Hinder, Delay or Defraud** .........................................20

        3.  **Transfers Occurred within One-Year PrePetition** ....................21

    B.  **There Is No Genuine Issue Of Material Fact That Defendant Knowingly and Fraudulently Made a False Oath and Should be Denied a Discharge Under 11 U.S.C. § 727(a)(4)(A)** ........................................................................21

        1.  **False Oath or Account**................................................................22

        2.  **Oath was Made Knowingly and Fraudulently** .........................24

        3.  **Oath Related to a Material Fact** ................................................25

    C.  **There is No Factual Dispute that Defendant Has Failed to Explain the Loss of Significant Assets and Should be Denied a Discharge Under 11 U.S.C. § 727(a)(5)** ...........................................................................................25

**1. Defendant Owned Identifiable Assets Prior to the Petition Date** ............**26**

**V.   CONCLUSION** ........................................................................................**28**

# TABLE OF AUTHORITIES

**CASES**                                                                                          **Page**

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242, 251 (1986) .................................................................. 17, 18

AutoSourceCapital, Inc. v. Traina (n re Traina),
   501 B.R. 379, 382 (U.S. 2013) ................................................................22

Celotex Corp. v. Catrett,
   477 U.S. 317, 323 (1986) .................................................................. 17, 18

First Nat'l Bank of Crosby v. Syrtveit (In re Syrtveit),
   105 B.R. 596 (Bankr. Mont. 1989) ..........................................................22

Frederick S. Wyle Professional Corp. v. Texaco, Inc.,
   764 F.2d 604, 608 (9th Cir. 1985) ..........................................................17

Hansen v. Moore (In re Hansen),
   368 B.R. 868, 872 (U.S. 2007) ........................................................22, 24

In re Ahaza Systems, Inc.,
   482 F.3d 1118, 1128 (9th Cir. 2007) .....................................................17

In re Aubrey,
   111 B.R. 268, 274 (9th Cir. B.A.P. 1990) ..........................................22, 25

In re Beaubouef,
   966 F.2d 174, 178 (5th Cir.1992) ..........................................................22

In re Beauchamp,
   236 B.R. 727, 732 (9th Cir. BAP 1999) .................................................18

In re Bernard,
   96 F.3d 1279, 1281–82 (9th Cir.1996) ..................................................19

In re Caneva,
   550 F.3d 755, 760 (9th Cir. 2008) ..........................................................17

In re Chalik,
   748 F.2d 616, 618 (11th Cir.1984) ...................................................25, 26

In re Coombs,
   193 B.R. 557, 564 (Bankr.S.D.Cal.1996) ..............................................24

In re DeMartino,
   448 B.R. 122, 128 (Bankr.E.D.N.Y.2011)..............................................20

In re Devers,
   759 F.2d 751, 755 (9th Cir. 1985) ..........................................................26

In re Guthrie,
   265 B.R. 253, 263 (Bankr. M.D. Ala. 2001) ..........................................21

In re Lawson,
    122 F.3d 1237, 1240 (9th Cir.1997) ........................................................................... 19

In re Searles,
    317 B.R. 368, 377 (B.A.P. 9th Cir. 2004) aff'd, 212 F. App'x 589 (9th
    Cir. 2006) ..................................................................................................................... 22

In re Tully,
    818 F.2d 106, 110 (1st Cir. 1987) ............................................................................... 21

In re Wills,
    243 B.R. 58, 65 (B.A.P. 9th Cir. 1999) ....................................................................... 20

Matushida Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574, 586 (1986) ............................................................................................ 18

NW. Motorcycle Ass'n v. U.S. Dept. of Agric.,
    18 F.3d 1468, 1471 (9th Cir. 1994) ............................................................................. 17

Retz v. Samson (In re Retz),
    606 F.3d 1189, 1193 (9th Cir. 2010) ............................................................. 24, 25, 26

Scott v. Harris,
    550 U.S. 372, 380 (2007) ............................................................................................ 17

## **STATUES**                                                                                      **Page**

11 U.S.C. § 727 ................................................................................................ 1, 16, 18, 28

11 U.S.C. § 727(a)(2) ..................................................................................................... 19

11 U.S.C. § 727(a)(2)(A) ............................................................................................. 2, 18

11 U.S.C. § 727(a)(4) ..................................................................................................... 24

11 U.S.C. § 727(a)(4)(A) ..................................................................................... 21, 22, 25

28 U.S.C. § 157(a) .......................................................................................................... 16

28 U.S.C. § 157(b)(2)(B) ................................................................................................ 16

28 U.S.C. § 1334(a) ........................................................................................................ 16

1

**RULES** **Page**

Federal Rules of Bankruptcy Procedure 7056 ........................................................... 2, 17

Federal Rules of Bankruptcy Procedure 9017 ............................................................... 17

Federal Rules of Civil Procedure 56 .......................................................................... 2, 17

Federal Rules of Civil Procedure 56(a) .......................................................................... 17

Federal Rules of Civil Procedure 56(c) .......................................................................... 17

Federal Rules of Evidence 201 ...................................................................................... 17

Federal Rules of Evidence 801(d) .................................................................................. 17

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2    **TO THE HONORABLE VICTORIA KAUFMAN, UNITED STATES BANKRUPTCY**

3    **JUDGE:**

4        Plaintiff Darren Kessler ("Kessler" or "Plaintiff") respectfully moves this Court for

5    summary judgment in his favor and against the defendant Peter M. Seltzer ("Seltzer,"

6    "Defendant," or "Debtor"), or, in the alternative, for summary adjudication, as to Plaintiff's

7    claims objecting to Defendant's discharge pursuant to sections 727(a)(2)(A), (a)(4)(A),

8    and (a)(5) of title 11 of the United States Code (the "Bankruptcy Code").

9        The Motion is made on the grounds that there are no triable issues of material fact

10   that would necessitate trial as to all the section 727 claims for relief, thus entitling Plaintiff

11   to a judgment as a matter of law.

12       The Motion is based upon the Plaintiff's Notice of Motion, the Motion, the

13   Memorandum of Points and Authorities, the Request for Judicial Notice, the Proposed

14   Statements of Uncontroverted Facts and Conclusions of Law, the Declaration of Craig G.

15   Margulies (the "Margulies Declaration") and the Proposed Summary Judgment filed and

16   lodged concurrently herewith, the pleadings and files in the above-captioned adversary

17   proceeding and the Debtor's bankruptcy case, and upon such further oral and

18   documentary evidence as may be presented to the Court or of which the Court may take

19   judicial notice.

20

21   DATED:  October 7, 2020                MARGULIES FAITH, LLP

22

23                                         By:_____*/s/ Craig G. Margulies*_____
                                               Craig G. Margulies
24                                             Monsi Morales
                                               Attorneys for Plaintiff Darren Kessler

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that the Court shall grant summary judgment or summary adjudication if the movant shows there is no genuine issue of material fact and movant is entitled to judgment as a matter of law.

In the instant case, Defendant fraudulently concealed and failed to disclose numerous valuable estate assets and claims, including bank accounts, interests in business entities and substantial pre-petition transfers to third parties and among the Debtor's multiple bank accounts (including those in the name of the Debtor's wholly-owned shell companies).   In his blatant attempts to hide his assets from the Court and his creditors, Defendant made repeated false oaths and accounts, under penalty of perjury, on his bankruptcy schedules and statements, including his amended schedules and statements, and at his initial chapter 11 341a meeting of creditors.  Moreover, Defendant has steadfastly refused to disclose fully and/or to explain transfers and expenditures of more than $1 million of the Debtor's cash within six months of the bankruptcy petition date.  These facts are not in dispute.

This Court ultimately converted the bankruptcy case from one under chapter 11 to one under chapter 7 due to the Debtor's demonstrated bad acts, false oaths, erroneous and misleading statements and accounts, and his failure to act as a fiduciary for the benefit of the bankruptcy estate and creditors.  The same facts support Plaintiff's claims to deny the Debtor his discharge under section 727(a) of the Bankruptcy Code.

Accordingly, no genuine issue of material fact exists, and Plaintiff is entitled to judgment as a matter of law with respect to his claims for relief under 727(a)(2)(A), (a)(4)(A), and (a)(5).

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.

## STATEMENT OF MATERIAL UNDISPUTED FACTS

### A.    The Parties

On July 9, 2019 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the case titled *In re Peter M. Seltzer*, Case No. 1:19-bk-11696-VK (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Central District of California.  (Plaintiff's Separate Statements of Uncontroverted Facts ("UF"), ¶ 1).  On December 26, 2019, the Court entered an order (Dkt. No. 98) converting the Bankruptcy Case to one under chapter 7.  (UF, ¶ 2).

Plaintiff Kessler is a creditor of the Debtor's, asserting a claim arising from obligations under a promissory note.  (UF, ¶ 3).  On November 12, 2019, Kessler timely filed Proof of Claim No. 7, asserting a claim in the sum of $840,767.20 (the "Kessler Claim").  (UF, ¶ 4).  On June 26, 2020, Kessler amended the Kessler Claim, asserting a claim in the sum of $1,038,762.36.  (UF, ¶ 5).

### B.    Defendant's Original Schedules and Statement of Financial Affairs

On the Petition Date, the Debtor filed his complete Schedules A through I (the "Schedules"), including his complete Statement of Financial Affairs ("SOFA," and collectively with the Schedules, the "Original Schedules", Dkt. No. 10). (UF, ¶ 6).  The Debtor signed the Original Schedules under penalty of perjury as true and accurate.  (UF, ¶ 7).

Among other things, the Debtor's Schedule A/B of the Original Schedules lists real property located at 4179 Prado de la Puma in Calabasas, California (the "Calabasas Property"), one of the primary assets of the Estate.  (UF, ¶ 8).  The Original Schedules reflect that the Debtor's personal and real property was worth $7,098,581.  (UF, ¶ 9).

Debtor's Schedule A/B of the Original Schedules revealed that he owned no ownership interests in any business, no amounts owed to the Debtor by others, no insurance policies and no cash as of the Petition Date.  (UF, ¶ 10).  The only accounts

3

listed by the Debtor were (a) an account at Chase holding approximately $121,000, which the Debtor stated was held "in trust", (b) an account at Merrill Lynch, which the Debtor stated was held as additional collateral for his mortgage, and (c) an IRA account. (UF, ¶ 11).

Despite listing no cash on hand or savings account on his Schedule A/B, Schedule I of the Original Schedules stated that the Debtor was "living off of savings and anticipates obtaining family assistance" and he was "optimistic about earning through business transactions."  (UF, ¶ 12).

The SOFA filed with the Original Schedules listed, among other things:

    a.  No income from employment or operation of a business in 2019 (SOFA No. 4);

    b.  Income from employment in 2018 of $250,000 (SOFA No. 4);

    c.  No transfers made within 90 days of the Petition Date (SOFA No. 6);

    d.  No payments to insiders within the one year prior to the Petition Date (SOFA No. 7-8);

    e.  No gifts within the two (2) years prior to the Petition Date (SOFA No. 13):

    f.  No loss or insurance coverage from theft, fire or other disaster (SOFA No. 15);

    g.  No transfers within the 2 years prior to the Petition Date (SOFA No. 18); and

    h.  An ownership interest in three business entities – ITM (Indiana Texas Management), 2305 LLC and Jakdyl LLC (SOFA No. 27).  (UF, ¶ 13).

**C.**    **Initial Chapter 11 §341(a) Meeting of Creditors**

On August 15, 2019, the Debtor appeared for his chapter 11 section 341(a) Meeting of Creditors, where he testified under oath regarding his assets and liabilities (the "341(a) Meeting").  (UF, ¶ 14). The 341(a) Meeting began with the Debtor testifying that all his assets were listed on his Original Schedules.[1] (UF, ¶ 15).

---

[1] See Certified Copy of transcript of 341(a) Meeting, attached to the Margulies

1    Later during the 341(a) Meeting, the Debtor revealed that he had an interest in

2    over 20 business entities[2], which he had failed to disclose in his Original Schedules.[3]

3    (UF, ¶ 16).  The Debtor testified that two or three of the omitted entities likely met the

4    criteria for inclusion on the SOFA, and that the Debtor would file an amendment to

5    identify such entities.[4]  (UF, ¶ 17). Upon further questioning by counsel for the Office of

6    the United States Trustee (the "OUST"), the Debtor testified that at least one of the

7    undisclosed business entities in which he had an ownership interest sold real property

8    within two years of the Petition Date.[5] (UF, ¶ 18). Despite explicit instruction by the

9    OUST for the Debtor to disclose the details of such sales in his amended Schedules and

10   SOFA, and an express promise under oath by the Debtor to do so, no further details

11   have been given and no further information was disclosed by the Debtor in his future

12   amendments. (UF, ¶ 19).

13    With respect to the three business entities that the Debtor included on his Original

14   Schedules, the Debtor testified that none of the three conducted any business

15   operations and he was the sole owner of each. (UF, ¶ 20).  The Debtor testified that the

16   entity 2305 LLC was "my personal LLC that I've used for various businesses."[6]  (UF, ¶

17   21). He further stated that 2305 LLC owned no assets; 2305 LLC "just has the cash, and

18   then I'm the sole member of the LLC."[7]  (UF, ¶ 22). When asked by the OUST about

19   Indiana Texas Management LLC ("ITM"), the Debtor testified as follows:

20    Q:    And the Indiana Texas Management, LLC – it's listed with no value.

21    A:    Yeah, it's being let go.  I'm not -- it was literally set up by ACC [one of the

22   Debtor's undisclosed business entities] as a vehicle for me to receive my payment, my

23

24   _____

Declaration as Exhibit A and lodged concurrently herewith (the "341(a) Transcript"), page

25   6:10-12.
     [2] The Debtor indicated that the OUST analyst had identified and asked the Debtor about

26   the 20 undisclosed entities at his Initial Debtor Interview.  (UF, ¶ 16).
     [3] See 341(a) Transcript, pp. 3:23-25, and 4:1-10.

27   [4] See 341(a) Transcript, pg. 4:11-13.
     [5] See 341(a) Transcript, pp. 16:12-25, and 17:1-10.

28   [6] See 341(a) Transcript, pg. 22:19-24.
     [7]  See 341(a) Transcript, pp. 22:25 and 23:1-5.

salaries in 2018.  The CPA wanted all the officers to have LLCs.  And once I left the company, I no longer get a salary to there, so I'm discontinuing that.[8] (UF, ¶ 23).

In addition, at the 341(a) Meeting the Debtor stated that, other than the accounts identified as his IRA and collateral for his mortgage (the Merrill Lynch account), he maintained "only one" bank account, the DIP account.[9] (UF, ¶ 24). He also disclosed for the first time at the 341(a) Meeting that his home (allegedly) had been significantly damaged by the Woolsey fire in 2018 and that the Debtor had received some money on his pre-Petition Date insurance claim.[10] (UF, ¶ 25).  Despite follow up questioning from the OUST, the Debtor failed to disclose the amount of money received or the additional amount he believed should or would be paid under his insurance policy. (UF, ¶ 26).  In fact, the Debtor received the following payments from his insurance company:

1.  $178,750 received prepetition, on or about May 21, 2019;

2.  $121,000 received post-petition, in or about July 2019; and

3.  $134,146.70 received post-petition, in or about September 2019.  (UF ¶ 27).

Additionally, the Debtor testified that no undisclosed transfers of real or personal property were made prior to the Petition Date.  Specifically, the Debtor testified that he did not loan money to anyone within four years prior to the Petition Date,[11] and that he did not transfer money in excess of $10,000 to anyone within two years of the Petition Date.[12]  (UF, ¶ 28). The Debtor did mention, however, that there may have been some "investments" that "didn't work out."[13]  (UF, ¶ 29). The Debtor did not elaborate what he meant by "investments" or why he believed such investments did not need to be disclosed on his Schedules or SOFA. (UF, ¶ 30).

Finally, the Debtor testified at the 341(a) Meeting that he had not provided money to anybody for the purpose of purchasing real property, stating as follows:

---

[8] See 341(a) Transcript, pg. 23:6-13.
[9] See 341(a) Transcript, pg. 31:13-22.
[10]  See 341(a) Transcript, pp. 9:8-11:6.
[11] See 341(a) Transcript, pg. 34:15-17.
[12] See 341(a) Transcript, pg. 38:7-15.
[13] See 341(a) Transcript, pg. 38:17-22.

1  Q:    Have you ever provided any – anybody monies to purchase real property?

2  A:    No.

3  Q:    Not within the last year?

4  A:    No.

5  Q:    Not in the last –

6        MR. RAICHELSON: What was the question?  I couldn't hear you.

7  Q:    Have you ever provided anybody any monies to purchase real property?

8  A:    No.[14] (UF, ¶ 31).

9  **D.    Debtor's Amended Schedules**

10      Two months after the 341(a) Meeting, on October 15, 2019, the Debtor filed

11  amended schedules and amended Statement of Financial Affairs ("Amended Schedules"

12  and "Amended SOFA," Dkt. No. 56). (UF, ¶ 32).  The Debtor filed the Amended

13  Schedules and Amended SOFA, both of which still contained incomplete and inaccurate

14  information, only **_after_** the Court granted the many FRBP 2004 motions filed by Kessler

15  against financial institutions where the Debtor and/or his entities maintained (or

16  previously had) accounts (including Bank of America, Merrill Lynch, Chase, Frost Bank,

17  Fidelity National Title Company, and Dara Mortgage), and **_just days after_** Kessler's

18  counsel discussed with Debtor's counsel the fact that the many bank statements and

19  documents obtained by Kessler from the Debtor's financial institutions evidenced the

20  Debtor's significant inaccuracies and omissions from his Original Schedules. (UF, ¶ 33).

21      Together, the Debtor's Amended Schedules and Amended SOFA disclosed the

22  following, which were not included in the Original Schedules:

23      a.  The Debtor was owed $50,000 from Brian Burr (Schedule A/B, Item 30);

24      b.  The Debtor had litigation claims against third parties (Schedule A/B, 33 and

25          34), including:

26          i.  Action against ACC Enterprises, *et. al.*, RE Holdings $2,500,000 of

27              real estate Misle sold in which Seltzer was a 49.16% owner as of

28  _____
[14] See 341(a) Transcript, pg. 30: 6-17.

Aug 10, 2018 with a value of $2,500,000;

    ii.    Potential action against ACC Shareholder derivative lawsuit (unknown value); and

    iii.    Potential action against Neal Harris for $550,000 related to Breach of Contract, Fraud (debtor was supposed to get investment return back via a business deal) with a value of $550,000;

c.  The Debtor had $6,850 gross income in 2018 for operating a business (Amended SOFA – Item 4);

d.  The Debtor received $150,000 received in the last year from a legal settlement (Amended SOFA – Item 5);

e.  The Debtor's property sustained $300,000 in damage in the November 2018 Woolsey fire (Amended SOFA – Item 15);

f.  The Debtor made two transfers of property pre-petition, including (i) a $550,000 transfer to Neal Harris in February 2019 as a "business investment to be repaid," and (ii) a $50,000 transfer in May 2019 to Brian Burr "temporarily," and to be returned "immediately" (Amended SOFA – Item 18); and

g.  The Debtor held an interest in an additional nine (9) businesses within the 4 years prior to the Petition Date, including[15]:

    i.    Colonial Partners LLC;

    ii.    MI-SIX, LLC;

    iii.    ACG Industries;

    iv.    Calveda Partners LLC;

    v.    Nevada Real Estate Holdings Group LLC;

    vi.    ACC Enterprises LLC;

---

[15] On or about January 9, 2020, the Debtor filed an Amended Schedule A/B (DN 106), which further disclosed an interest in another entity called "Resurgent." (See DN 106, question 44).  (UF, ¶ 35).

vii.    Building Management Co. A;

viii.   Building Management Co. B; and

ix.    Building Management Co. C, (UF, ¶ 34).

To date, Debtor's schedules remain deficient in disclosing all of Debtor's assets as of the Petition Date. (UF, ¶ 36).

**E.    The Monthly Operating Reports**

The Debtor tardily filed almost every Monthly Operating Report during the chapter 11 period of the Bankruptcy Case (the "Chapter 11 Period").[16]  (UF, ¶ 37). The MORs reflect that the Debtor had no income during these months, beyond receipt of insurance proceed checks in July and September, in the amounts of $121,000 and $134,146.70, respectively. (UF, ¶ 38).  The MORs further reflect that the Debtor maintained an account under the name of 2305 LLC (the "2305 Account"), as well as an account under ITM (the "ITM Account"), neither of which was designated a "debtor-in-possession" account or disclosed on the Debtor's Original or Amended Schedules. (UF, ¶ 39). The Debtor used the 2305 Account and the ITM Account to pay most of his personal expenses (i.e. gas, restaurants, travel, utilities, car payments, etc.) prior to and during the Chapter 11 Period. (UF, ¶ 40).

**F.    Additional Assets and Transfers Discovered by Plaintiff**

Following the 341(a) Meeting, Kessler proceeded to file multiple motions for FRBP 2004 examinations (the "2004 Motions"), mainly against financial institutions where the Debtor currently had (and/or had in the past) accounts, and/or where the Debtor's wholly-owned companies currently had (or had in the past) accounts. (UF, ¶ 41). Plaintiff's investigations and discovery occurred between the initial 341(a) Meeting and the filing of the Amended Schedules and SOFA.  (UF, ¶ 42).  Based on the documents received from third parties pursuant to the 2004 Motions, Plaintiff discovered

---

[16] The Debtor filed MORs for July 2019 (DN. 41 and DN 66, amended), August 2019 (DN. 46 and DN 67, amended), September 2019 (DN 68), October 2019 (DN 69), November 2019 (DN 86) and December 2019 (final report and accounting, DN 125) (together, the "MORs").  (UF, ¶ 36).

many assets, transfers and other transactions that were not disclosed by the Debtor on his Original Schedules or, in some cases, on his Amended Schedules.  (UF, ¶ 43).

1.    Undisclosed Business Entities

Plaintiff discovered that the Debtor has or had, within four years of the Petition Date, an interest in the following entities that were not listed in the Debtor's Original Schedules (the "Undisclosed Entities"):

a.  Jakdyl Inc, a Wyoming Corporation;

b.  Colonial Licensing Partners, LLC;

c.  ACC Enterprises, LLC, a Nevada Corporation; and

d.  ACG Industries, Inc., a Nevada Corporation. (UF, ¶ 44).

2.  Bank Accounts and Undisclosed Transfers

The results of Plaintiff's discovery further unveiled several bank accounts in the name of the Debtor or certain of his wholly-owned entities, including the 2305 Account and the ITM Account, which were not disclosed on his Original Schedules or his Amended Schedules and through which the Debtor concealed and spent a significant amount of money for his own benefit. (UF, ¶ 45).  Plaintiff's investigation revealed a consistent pattern of the Debtor moving funds from one account to another, making large withdrawals or transfers, and paying the Debtor's personal expenses.  Specifically, prepetition, the Debtor often and freely moved funds in and out of the accounts of his entities, including the 2305 Account and the ITM Account, and into and out of the Debtor's personal accounts in an effort to hide funds from creditors and for the Debtor's own personal use.  (UF, ¶ 46).

a.    The Chase Account

Kessler discovered that the Debtor maintained a bank account, in the Debtor's name, at Chase Bank (the "Chase Account") during the pendency of this Bankruptcy Case (the Chapter 11 Period) and immediately prior to the Petition Date. (UF, ¶ 47).  On or about May 21, 2019, the Debtor received over $178,750 in insurance proceeds, which

were deposited into the Chase Account. (UF, ¶ 48).  As of the Petition Date, less than

two months later, only $126,000 of these funds remained and were deposited into the

DIP account. (UF, ¶ 49). Plaintiff's discovery uncovered that the Debtor withdrew from

the Chase Account $40,000 on May 29, 2019 (for alleged "Tactical Mitigation Services"),

an additional $9,866.64 on the day prior to the Petition Date, and further $2,832 _after_ the

Petition Date on July 23, 2019 (together, the "Insurance Proceed Transfers"). (UF, ¶ 50).

The Debtor has failed to explain fully the purpose of the Insurance Proceed

Transfers and the loss of $52,000 in insurance proceeds immediately prior to or after the

Petition Date and failed to disclose the Insurance Proceed Transfers on his Original

Schedules and SOFA or his Amended Schedules and SOFA. (UF, ¶ 51).

b.      The 2305 Account

On the Petition Date, the Debtor had a Wells Fargo Bank account held in the

name of 2305 LLC (the "2305 Account"), which account was closed post-petition, in or

about September 2019. (UF, ¶ 52). This 2305 Account was only discovered through

documents and information produced through the 2004 Motions filed by Kessler, as

neither the 2305 Account nor the cash deposited therein was disclosed in the Debtor's

Original Schedules and SOFA. (UF, ¶53).  However, based on the documents

uncovered by and produced to Kessler, a review of the filed MORs and the Debtor's own

testimony under oath at the 341(a) Meeting, (a) the Debtor was the sole owner of 2305

LLC and had control of the 2305 Account, (b) 2305 LLC was not operating a business

and was maintained for the Debtor's personal use, and (c) the Debtor withdrew large

sums of money for personal use prior to the Bankruptcy Case filing and paid personal

household expenses from the 2305 Account both pre- and post-petition. (UF, ¶ 54).

Based on a review of bank statements obtained by Kessler, the Debtor made the

following withdrawals and/or transfers from the 2305 Account between February 2019

and the Petition Date, none of which was disclosed in the Debtor's Original Schedules or

Amended Schedules (together, the "Pre-Petition 2305 Transfers"):

- February 26, 2019: Wire to Fidelity National Title in the amount of $50,000;

11

- March 18, 2019: Wire to ETF Management in the amount of $150,000;

- April 19, 2019: Wire to Harris Ritoff in the amount of $100,000;

- May 20, 2019: Two withdrawals in the amount of $28,000 and $7,000, respectively; and

- May 28, 2019: One withdrawal in the amount of $4,000. (UF, ¶ 55).

The Debtor has not offered any explanation for where the $339,000 in Pre-Petition 2305 Transfers was spent in the five months prior to the Petition Date, for what purpose and what the Debtor received in exchange for the significant sums transferred, if anything. (UF, ¶ 56).

c.      The ITM Accounts

On the Petition Date, the Debtor had two Frost Bank accounts, ending in x0639 and x0647, held in the name of ITM (the "ITM Accounts"). (UF, ¶ 57).  Like the 2305 Account, the ITM Accounts were only discovered through documents and information produced through the 2004 Motions filed by Kessler. (UF, ¶ 58).  Moreover, despite the fact that the Debtor testified under oath at his 341(a) Meeting that ITM was wholly-owned by the Debtor and created solely for the purpose of receiving income and other payments owing to the Debtor from another of his entities in 2018, neither the ITM Accounts nor the cash deposited therein were disclosed in the Debtor's Original Schedules and SOFA or his Amended Schedules and SOFA. (UF, ¶ 59).  Also similarly to the 2305 Account, based on the documents produced to Kessler and a review of the filed MORs, the Debtor withdrew large sums of money for personal use pre-petition and paid personal household expenses from the ITM Accounts both before and after the Petition Date. (UF, ¶ 60).

Based on a review of bank statements obtained by Kessler, the Debtor had nearly $900,000 in the ITM Accounts in January 2019, a little more than six months before the Petition Date. (UF, ¶ 61).  During the time leading up to the Petition Date, the Debtor transferred, withdrew, and/or spent all but $36,000 of that money. (UF, ¶ 62).

Specifically, the bank statements for ITM Accounts demonstrate that the Debtor made the following withdrawals and/or transfers from the ITM Accounts during the one year prior to the Petition Date, none of which was disclosed in the Debtor's Original Schedules or Amended Schedules (collectively, the "Pre-Petition ITM Transfers," and together with the Pre-Petition 2305 Transfers, the "Pre-Petition Transfers"):

- August 27, 2018: Transfer from x0639 to x0647 in the amount of $800,000;
- February 7, 2019: Wire to 2305 Account in the amount of $10,000;
- February 12, 2019: Wire to Fidelity National Title in the amount of $500,000;
- March 13, 2019: Transfer from x0647 to x0639 in the amount of $170,000;
- March 15, 2019: Wire to 2305 Account in the amount of $170,000;
- March 15, 2019: Transfer from x0647 to x0639 in the amount of $60,000;
- May 13, 2019:  Transfer from x0647 to x0639 in the amount of $20,000; and
- May 28, 2019: Transfer from x0647 to x0639 in the amount of $45,431.68.
  (UF, ¶ 63).

The Debtor failed to disclose any of the above Pre-Petition ITM Transfers on his Original Schedules and SOFA or Amended Schedules and SOFA. (UF, ¶ 64).  In addition, the Debtor has not offered any explanation for (a) why the Debtor engaged in this pattern of transferring large sums of money between and among his wholly-owned entities, if not to conceal the funds from creditors, or (b) where the nearly $900,000 from the ITM Accounts was spent in the six months prior to the Petition Date, for what purpose and what the Debtor received in exchange for the significant Pre-Petition ITM Transfers, if anything. (UF, ¶ 65).

### 3.    The Undisclosed "Gift" to Neal Harris

As stated above, Kessler's investigations revealed that the Debtor transferred a total of $550,000 from the 2305 Account and the ITM Account no. x0647 to Fidelity National Title in Las Vegas, Nevada ("Fidelity"), in February 2019. (UF, ¶ 66). The outgoing wire transfer receipt from Frost Bank for the $500,000 Pre-Petition ITM Transfer includes the memo line "sale/purchase of property." (UF, ¶ 67).  As the Debtor

1   did not disclose any real property owned or purchased in Nevada on his Original

2   Schedules and SOFA, Kessler sought documents via a 2004 Motion from Fidelity. (UF, ¶

3   68).

4        The documents produced by Fidelity demonstrate that $550,000 in Pre-Petition

5   Transfers (the "Harris Transfers") were used as down payment on the purchase of real

6   property located at 4201 San Alivia Court, Las Vegas, Nevada (the "LV Property"), with a

7   purchase price of $1,740,000. (UF, ¶ 69).  Despite contributing more than 30% of the

8   purchase price, title to the LV Property was not taken in the Debtor's name or in the

9   name of his businesses; rather, the LV Property purportedly was purchased by Neal and

10  Francesca Harris. (UF, ¶ 70).  As part of the escrow paperwork for the purchase of the

11  LV Property, the Debtor signed two "gift letters," stating that the Debtor was gifting to

12  Neal and Francesca Harris the amounts of $550,000 and $50,000, to be applied toward

13  the purchase of the LV Property. (UF, ¶ 71). Each gift letter also states that Mr. and Mrs.

14  Harris are the "nephew" and "niece" of the Debtor. (UF, ¶ 72).

15       The Debtor has offered evasive and inaccurate testimony with respect to the

16  Harris Transfers.  First, at the 341(a) Meeting, when asked by counsel for Kessler if the

17  Debtor knew Neal Harris, the Debtor responded affirmatively and stated simply that Mr.

18  Harris was a former employee at ACC Enterprises LLC.[17] (UF, ¶ 73).  The Debtor did not

19  mention that the Harrises are relatives (and insiders) of the Debtor or that the Debtor had

20  gifted them more than half a million dollars five months before filing for bankruptcy relief.

21  (UF, ¶ 74).

22       In the Debtor's Amended Schedules and Amended SOFA, the Debtor tells

23  another story altogether.  On the Amended Schedule A/B, the Debtor discloses, for the

24  first time, that he holds a "potential action against Neal Harris for $550,000 related to

25  Breach of Contract/Fraud (Debtor was supposed to get investment returns back via a

26  business deal)."[18] (UF, ¶ 75).  Further, in his Amended SOFA, the Debtor does not

27  ────────────────────

28  [17] See 341(a) Transcript, pg. 31:6-9.
    [18] When asked at the 341(a) Meeting whether Neal Harris is somebody that the Debtor is
    suing, the Debtor stated, "No, I'm not," and did not disclose any potential claim.  See

identify the Harris Transfers as gifts (Amended SOFA – Item 13) or as transfers to or for

the benefit of insiders (including family members) (Amended SOFA – Item 7-8).  Rather,

the Debtor now identifies the $550,000 Harris Transfers as a "business investment to be

repaid" made to Neal Harris, an "unrelated 3d part[y]." (UF, ¶ 77).

> 4.    Transfer to Brian Burr

On the Debtor's Amended Schedules and SOFA, the Debtor disclosed, for the

first time, that he transferred $50,000 to Brian Burr (the "Burr Transfer") in or about May

2019, less than two months prior to the Petition Date. (UF, ¶ 78).  The Debtor fails to

identify exactly when such transfer was made, from which account the transfer was

made, or the true purpose of the transfer. (UF, ¶ 79).  The only explanation offered by

the Debtor is nonsensical and does not meet the standard of complete disclosure and

honesty required of a bankrupt debtor.  In the Amended SOFA, Item 18, the Debtor lists

the transfer made to Brian Burr and states that the funds were transferred "temporarily

with the belief that [Mr. Burr] was going to return them immediately." (UF, ¶ 80).  The

Debtor further goes on to state that this type of transaction (*i.e.*, "temporarily" giving tens

of thousands of dollars to an "unrelated 3d party" with the expectation that said funds

would be returned "immediately") was in the ordinary course of the Debtor's business.

(UF, ¶ 81).

> 5.    Misrepresentations regarding Income

Under penalty of perjury, the Debtor asserts in Amended SOFA, Item 4, that he

received $250,000 in employment income and $6,850 in income from operating a

business for the calendar year 2018, and no other income. (UF, ¶ 82).   Further, under

penalty of perjury, the Debtor asserts in Amended SOFA, Item 27, that the Debtor held

an interest in ACG Industries ("ACG") and that ACG was shut down in 2017.[19] (UF, ¶ 83).

A review of the Debtor's Frost Bank statements for the ITM Account x0639 from

March to May 2018 evidence that the Debtor received $905,000 in 2018 from ACG

---

341(a) Transcript, pg. 31:10-12.  (UF, ¶ 76).

[19] The Debtor also testified that ACG shut down in 2017 at his 341(a) Meeting.  See
341(a) Transcript, pg. 4:22-25.  (UF, ¶ 84).

1    Industries through ITM. (UF, ¶ 85).  As the Debtor testified under oath at the 341(a)

2    Meeting, ITM had no business operations and was established solely as a vehicle to

3    receive salary owed to the Debtor from ACG Industries.[20] (UF, ¶ 86).

4        The documented income received by the Debtor from ACG in 2018 is three times

5    (3x) greater than what the Debtor disclosed in the Debtor's Amended SOFA, and

6    evidences that ACG was still operating in 2018, despite Debtor's false testimony that it

7    was shut down in 2017.  (UF, ¶ 87).

8        **G.    The 727 Complaint**

9        On or about December 12, 2019, the Plaintiff filed a complaint against the Debtor

10    for Nondischargeability of Debt under 11 U.S.C § 523 et seq. and Denial of Discharge

11    under 11 U.S.C. § 727 et seq., Adversary Proceeding No. 1:19-ap-01151-VK (the

12    "Adversary Proceeding"). (UF, ¶ 88).  Plaintiff filed his First Amended Complaint (the

13    "FAC") against the Debtor on May 12, 2020. (UF, ¶ 89).

14        On August 19, 2020, Defendant filed an Answer in the Adversary Proceeding,

15    denying most of the allegations of the FAC. (UF, ¶ 90).  Defendant admitted that this

16    Court has jurisdiction over this Adversary Proceeding and that venue is proper. (UF, ¶91).

17                        **III.**

18                    **LEGAL STANDARD**

19        **A.    Jurisdiction in this Court is Proper**

20        This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §

21    1334(a) (the district courts shall have original and exclusive jurisdiction of all cases

22    under title 11) and 28 U.S.C. § 157(a) (authorizing the district courts to refer all title 11

23    cases and proceedings to the bankruptcy judges for the district). (Plaintiff's [Proposed]

24    Separate Statement of Conclusions of Law ("CL"), ¶ 1).

25        This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) (allowance

26    or disallowance of claims against the estate). (CL, ¶ 2). This action relates to the chapter

27    7 bankruptcy case filed in the United States Bankruptcy Court, San Fernando Valley

28    _____
[20] See 341(a) Transcript, pg. 23:6-18.

Division, entitled *In re Peter M. Seltzer*, Case No. 1:19-bk-11696-VK on the docket of the Court.[21]  *See* Plaintiff's Request for Judicial Notice ("RJN"), filed concurrently herewith.

**B.    The Standard For Summary Judgment Or Summary Adjudication**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure ("FRBP"), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* FRCP 56(a); FRBP 7056. (CL, ¶ 3). "The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the [material] facts before the court."  *NW. Motorcycle Ass'n v. U.S. Dept. of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). (CL, ¶ 4).

A party moving for summary judgment under Rule 56 need not negate its opponent's claim; rather the moving party need only point to the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). (CL, ¶ 5). Once the moving party has met this initial burden, the burden shifts to the opposing party to "set out specific facts showing a genuine issue for trial," *Id.* at 324 (CL, ¶ 6), and must "affirmatively show that a material issue of fact remains in dispute and may not simply rest on hope of discrediting movant's evidence at trial." *Frederick S. Wyle Professional Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985). (CL, ¶ 7).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable trier of fact could find for the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *In re Ahaza Systems, Inc.*, 482 F.3d 1118, 1128 (9th Cir. 2007). (CL, ¶ 8).  A factual dispute is "material" only if it might affect the outcome of the proceeding under applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *In re Caneva*, 550 F.3d 755, 760 (9th Cir. 2008). (CL, ¶ 9).  Moreover, "when the moving party has carried its burden under 56(c), its opponent must do something more than simply show there is some

---

[21] Plaintiff respectfully requests that the Court take judicial notice of Debtor's Bankruptcy Petition and other documents filed therewith and any amendments that are in the Court's file, pursuant to Fed. R. Evid. 201, as made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 9017. The information contained in these documents is admissible pursuant to Fed. R. Evid. 801(d).

metaphysical doubt as to the material facts." *Matushida Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  (CL, ¶ 10).  The mere scintilla of evidence in support of the opposing party's position will be insufficient to overcome summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251. (CL, ¶ 11).

The Supreme Court's decisions in *Matsushida* and *Celotex* reflect the Court's desire to resolve cases at the summary judgment level rather than litigate a case where there is only a scintilla of evidence that creates a hint of a genuine issue of fact.

As set forth below and as evidenced by the declarations and exhibits filed concurrently herewith, there are no genuine issues of material fact with respect to the section 727 claims in this Adversary Proceeding for trial. Therefore, Plaintiff is entitled to judgment as a matter of law as to all claims for relief under section 727 of the Bankruptcy Code contained in the FAC.

## IV.

## <u>ARGUMENT</u>

**A.** <u>**There is no Genuine Issue of Material Fact that Defendant Transferred and Concealed Property in the Year Preceding the Bankruptcy Filing such that He Should be Denied a Discharge Under 11 U.S.C. § 727(a)(2)(A)**</u>

Section 727(a)(2)(A) of the Bankruptcy Code states that:

(a) The Court shall grant the debtor a discharge, unless – . . .
(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition….

(CL, ¶ 12).

"Two elements comprise an objection to discharge under § 727(a)(2)(A): (1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor..." *In re Beauchamp,* 236 B.R.

1   727, 732 (9th Cir. BAP 1999) (quoting *In re Lawson,* 122 F.3d 1237, 1240 (9th

2   Cir.1997)). (CL, ¶ 13).  The transfer must occur within one year prepetition. *Id.* at 1240.

3   (CL, ¶ 14).  Lack of injury to creditors is irrelevant under § 727(a)(2). *In re Bernard,* 96

4   F.3d 1279, 1281–82 (9th Cir.1996).  (CL, ¶ 15).

5        Here, the undisputed facts establish grounds for a denial of Defendant's

6   discharge under Bankruptcy Code section 727(a)(2)(A).

7        **1.      Disposition and Concealment of Property**

8        Plaintiff's investigation has revealed that Defendant, with the intent to hinder,

9   delay, or defraud Plaintiff, has transferred, concealed and/or otherwise disposed of

10  property of the Debtor, including all or part of the Pre-Petition Transfers (including the

11  Harris Transfers), the Insurance Proceed Transfers and the Burr Transfer.  Further, the

12  Debtor has a demonstrated pattern of hiding his income and money in undisclosed bank

13  accounts held by his wholly-owned companies that have no business purpose, but

14  merely serve as the Debtor's personal piggy bank away from creditors' eyes.  The ample

15  evidence of the Debtor's regular transfers of substantial sums between and among his

16  accounts, including those accounts held by the Debtor's shell companies, shows the

17  Debtor's intentional efforts to conceal his money and true financial condition from

18  creditors.

19       The Pre-Petition Transfers (including the Harris Transfers), Insurance Proceed

20  Transfers and the Burr Transfer were not disclosed in the Debtor's Original Schedules.

21  Only after Plaintiff conducted extensive discovery and brought up inaccuracies in the

22  Schedules to Debtor's counsel did the Debtor amend his schedules and disclose (still

23  inaccurately) the Burr Transfer and the Harris Transfers.  The Amended Schedules

24  remain silent as to the remaining Pre-Petition Transfers and the Insurance Proceed

25  Transfers.

26       Further, neither the Original Schedules and SOFA nor the Amended Schedules

27  and SOFA identify the 2305 Account or the ITM Accounts, or the money held therein as

28  of the Petition Date.  The Debtor testified that these accounts were set up to receive the

1  Debtor's income and payments, and the MORs and the relevant bank statements

2  demonstrate that the 2305 Account (until its closure in September 2019) and the ITM

3  Accounts were the primary accounts from which the Debtor paid his personal and

4  household expenses, both before and after the Petition Date.

5        Finally, the Debtor's testimony at the 341(a) Meeting and subsequent statements

6  made under penalty of perjury in his Amended Schedules and SOFA evidence that the

7  Debtor initially concealed the existence of the Debtor's interest in multiple business

8  entities and nearly $175,000 in insurance proceeds received by the Debtor (with

9  additional amounts expected) for undisclosed fire damage to the Debtor's real property.

10       Thus, there is no genuine issue of material fact that Defendant concealed and/or

11 transferred his property.

12       **2.**      **<u>Intent to Hinder, Delay or Defraud</u>**

13       The necessary intent under § 727(a)(2) "may be established by circumstantial

14 evidence, or by inferences drawn from a course of conduct." *In re Wills*, 243 B.R. 58, 65

15 (B.A.P. 9th Cir. 1999). (CL, ¶ 16). As a debtor ordinarily will not admit to intentionally

16 hindering, delaying, or defrauding creditors, fraudulent intent may be shown by

17 circumstantial evidence, or by inferences drawn from a course of conduct. *In re*

18 *DeMartino,* 448 B.R. 122, 128 (Bankr. E.D.N.Y. 2011) (citing *Salomon v. Kaiser (In re*

19 *Kaiser),* 722 F.2d 1574, 1582–83 (2d Cir.1983)). (CL, ¶ 17).

20       Here, the evidence overwhelmingly demonstrates that Defendant had the intent to

21 delay or defraud creditors by failing to disclose significant assets or monies in his

22 Schedules or reveal such items to at the 341(a) Meeting. Specifically, Defendant failed

23 to list his interests in multiple business entities, his insurance proceeds (received and

24 expected) and his various bank accounts, including those in the names of the Debtor's

25 shell companies, over which the Debtor had exclusive control. The evidence also proves

26 that the Debtor engaged in a pattern of transferring significant amounts of money

27 between his bank accounts (including the accounts of his wholly-owned companies) or to

28 friends and family in an egregious effort to shield such funds from creditors.

1    Based on the foregoing, there is no genuine issue of material fact that the

2    Defendant had the intent to hinder, delay, or defraud creditors.

3    **3.    Transfers Occurred within One-Year Prepetition**

4    The Pre-Petition Transfers, including the Harris Transfers, and the Burr Transfer

5    all occurred within one year of the Petition Date, with the majority of the transfers

6    occurring within six months prior to the Petition Date.

7    Accordingly, based on Defendant's own accounting and the evidence discovered

8    by Plaintiff, there is no genuine issue of material fact that Defendant concealed and

9    disposed of property with the intent to hinder, delay or defraud creditors in the one year

10    preceding the Petition Date. As a result, Plaintiff is entitled to judgment as a matter of

11    law, denying the Debtor's discharge under Bankruptcy Code section 727(a)(2)(A).

12    **B.    There is No Genuine Issue of Material Fact that Defendant Knowingly**

13    **and Fraudulently Made a False Oath and Should be Denied a**

14    **Discharge Under 11 U.S.C. § 727(a)(4)(A)**

15    Plaintiff also requests denial of discharge under § 727(a)(4).  This section, in

16    relevant part, states that a debtor may not be granted a discharge if:

17    (4) the debtor knowingly and fraudulently, in or in connection with the

18    case—

19    (A) made a false oath or account;

20    . . .

21    (CL, ¶ 18).

22    The purpose of § 727(a)(4)(A) is not punishment, but rather a protection to

23    "ensure that adequate information is available to the trustee and all interested parties." *In*

24    *re Guthrie*, 265 B.R. 253, 263 (Bankr. M.D. Ala. 2001).  (CL, ¶ 19).  Stated differently, its

25    purpose is to ensure that "those who seek the shelter of the bankruptcy code do not play

26    fast and loose with their assets or with the reality of their affairs." *In re Tully*, 818 F.2d

27    106, 110 (1st Cir. 1987).  (CL, ¶ 20).  The fundamental purpose of § 727(a)(4)(A) is to

28    ensure that the trustee and creditors have accurate information without having to

21

1    conduct costly investigations. *In re Aubrey,* 111 B.R. 268, 274 (9th Cir. B.A.P. 1990).

2    (CL, ¶ 21).  "[T]he opportunity to obtain a fresh start is ... conditioned upon truthful

3    disclosure." *Id.*  (CL, ¶ 22).

4            It is not required that the object of the false oath be detrimental to creditors.  *See,*

5    *In re Haverland*, 150 B.R. 768, 771 (Bankr. S.D. Cal. 1993); *Matter of Hussan*, 56 B.R.

6    288, 290 (Bankr. E.D. Mich. 1985).  (CL, ¶ 23).  Even if the false oath relates to an asset

7    of no value, it is still a sufficient basis to deny a debtor a discharge.  *Scimeca v.*

8    *Umanoff*, 169 B.R. 536 (D.N.J. 1993), *aff'd* 30 F.3d 1488 (3d Cir. 1994) (A debtor is

9    required to disclose seemingly worthless assets).  (CL, ¶ 24).

10           To succeed on a section 727(a)(4)(A) claim, the objecting party must demonstrate

11   that: (1) a false or statement was made by the debtor; (2) knowingly and fraudulently; (3)

12   which was material to the course of the bankruptcy proceedings. *First Nat'l Bank of*

13   *Crosby v. Syrtveit (In re Syrtveit),* 105 B.R. 596 (Bankr. Mont. 1989).  (CL, ¶ 25).

14           1.    **False Oath or Account**

15           A false oath is complete when made.  *In re Searles*, 317 B.R. 368, 377 (B.A.P. 9th

16   Cir. 2004), aff'd, 212 F. App'x 589 (9th Cir. 2006).  (CL, ¶ 26).  A false oath may involve

17   a false statement or omission in the debtor's schedules. *In re Beaubouef,* 966 F.2d 174,

18   178 (5th Cir.1992).  (CL, ¶ 27).  Where the offending oath is contained in the schedules

19   or required statements, the debtor's continuing duty to assure the accuracy of such

20   schedules and statements means that the proper method of correction is a formal

21   amendment of the schedules. *Id.*  (CL, ¶ 28).  Moreover, failing to rectify inconsistencies

22   and omissions when filing amended schedules may be weighed in favor of finding the

23   requisite intent to deceive. *AutoSourceCapital, Inc. v. Traina (n re Traina*), 501 B.R. 379,

24   382 (U.S. 2013).  (CL, ¶ 29).

25           Here, the Defendant made a false oath or account in his Original Schedules and

26   SOFA and/or his Amended Schedules and SOFA when he declared that:

27                 a.  He earned income from employment or operation of a business in 2018 of

28                     $250,000 (SOFA and Amended SOFA, No. 4), when he had received more

than $905,000 from ACG through ITM, the business he created solely for the purpose of receiving salary and payments from ITM;

b.  He made no payments to insiders within the one year prior to the Petition Date (SOFA and Amended SOFA, No. 7-8), although his "gift letters" executed in conjunction with the Harris Transfers state that the Harrises were his "niece" and "nephew";

c.  He gave no gifts within the two (2) years prior to the Petition Date (SOFA and Amended SOFA, No. 13), which is contradicted by his executed "gift letters" made in connection with the Harris Transfers;

d.  The property of the estate suffered no loss or insurance coverage from theft, fire or other disaster (SOFA No. 15), despite the fact that the Debtor's residence allegedly was damaged by the November 2018 Woolsey fire and the Debtor had received more than $178,000 in insurance proceeds by the Petition Date, and $155,146.70, in the aggregate, after the Petition Date;

e.  The Debtor made no transfers within the 2 years prior to the Petition Date (SOFA and Amended SOFA, No. 18), other than the Harris Transfers and the Burr Transfer – which were only disclosed in the Amended SOFA; the Insurance Proceeds Transfers and the remaining Pre-Petition Transfers are still omitted;

f.  The Debtor only held an interest in three business entities – ITM (Indiana Texas Management), 2305 LLC and Jakdyl LLC (SOFA No. 27).

The Debtor also knowingly, fraudulently and intentionally failed to list assets and other financial information in his Original Schedules and SOFA and/or his Amended Schedules and SOFA, including, but not limited to, the Undisclosed Entities, the insurance policy proceeds received pre-petition and expected post-petition, his significant income in 2018 and his various bank accounts held in his name and the name of his wholly-owned entities.

//

The foregoing evidence establishes Defendant's many false oaths, failure to disclose valuable estate assets, concealment of large amounts of cash, concealment and depletion of business bank accounts in his control, and failure to disclose substantial prepetition transfers.

### 2.    Oath was Made Knowingly and Fraudulently

A debtor acts knowingly if he acts deliberately and consciously.  *Retz v. Samson (In re Retz),* 606 F.3d 1189, 1193 (9th Cir. 2010).  (CL, ¶ 30).  To demonstrate fraudulent intent, Plaintiff must show that: (1) the debtor made the representations (a false statement or omission in the bankruptcy schedules); (2) at the time he knew they were false; and (3) he made them with the intention and purpose of deceiving the creditors. *Id.* (CL, ¶ 31).  A court may find the requisite intent where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth. *In re Coombs,* 193 B.R. 557, 564 (Bankr. S.D. Cal.1996).  (CL, ¶ 32).  Further, intent under section 727(a)(4) may be established by circumstantial evidence, or by inferences drawn from a course of conduct.  *Hansen v. Moore (In re Hansen),* 368 B.R. 868, 872 (9th Cir. B.A.P. 2007). (CL, ¶ 33).

Here, Defendant has engaged in a pattern of reckless indifference to the truth. Defendant failed to disclose multiple business interests, bank accounts, significant sums of money and large prepetition transfers.  Most of those have not been disclosed under penalty of perjury by the Debtor to this day, and the few matters he did disclose in his Amended Schedules and SOFA continue to have significant inaccuracies or outright falsehoods.

In fact, the Court, in its ruling on Plaintiff's motion to convert the Bankruptcy Case to one under chapter 7, found that, "The debtor has not provided the Court with a complete or accurate picture of his assets, liabilities and transactions."  (UF, ¶ 92).  Upon review and consideration of the evidence, the Court further found that, "After filing highly inaccurate schedules and statements, the debtor did not file his amended schedule A/B and amended statement of financial affairs, until *after* Mr. Kessler filed several motions

1  for Rule 2004 examinations. The amended schedule A/B and amended statement of

2  financial affairs filed by the debtor appear to remain inaccurate." (emphasis in original).

3  (UF, ¶ 93).

4  **3.      Oath Related to a Material Fact**

5  Section 727(a)(4)(A) requires that the relevant false oath relate to a material fact.

6  *In re Retz*, 606 F.3d 1189 (9th Cir. 2010) (citing *Roberts v. Erhard (In re Roberts)*, 331

7  B.R. 876, 882 (9th Cir. B.A.P. 2005)).  (CL, ¶ 34).  Materiality is broadly defined.  "A fact

8  is material 'if it bears a relationship to the debtor's business transactions or estate, or

9  concerns the discovery of assets, business dealings, or the omission or misstatement

10  that "detrimentally affects the administration of the estate" is material. *Id.* at 1198

11  (citations omitted); *see also, In re Chalik,* 748 F.2d 616, 618 (11th Cir.1984).  (CL, ¶ 35).

12  The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors

13  have accurate information without having to conduct costly investigations. *In re Aubrey,*

14  111 B.R. 268, 274 (9th Cir. B.A.P. 1990).  (CL, ¶ 36).

15  Here, there is no question that the Defendant's significant omissions on his

16  bankruptcy schedules, failure to disclose and attempts to conceal numerous valuable

17  estate assets are material facts.  Moreover, Defendant's false testimony under oath at

18  the 341(a) Meeting and continued efforts throughout this Bankruptcy Case to conceal

19  assets from the Court and his creditors all relate to material facts.

20  Accordingly, there is no genuine issue of material fact as to whether the

21  Defendant made a false oath, and summary judgment should be granted under

22  Bankruptcy Code section 727(a)(4)(A).

23  **C.      There is No Factual Dispute that Defendant has Failed to Explain the**

24  **Loss of Significant Assets and Should be Denied a Discharge Under**

25  **11 U.S.C. § 727(a)(5)**

26  Section 727(a)(5) of the Bankruptcy Code states that:

27  (a) The Court shall grant the debtor discharge unless -- . . .

28

(5) the debtor has failed to explain satisfactorily, before determination of denial

of discharge under this paragraph, any loss of assets or deficiency of assets to

meet the debtor's liabilities…

(CL, ¶ 37).

Under section 727(a)(5), the plaintiff bears the initial burden of proof and must

demonstrate that: (1) the debtor, at one time not too remote from the bankruptcy petition

date, owned identifiable assets; (2) on the date the bankruptcy petition was filed, the

debtor no longer owned the assets; and (3) the bankruptcy pleadings, schedules, or

statement of affairs do not reflect an adequate explanation for the disposition of the

assets.  *See Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1205 (9th Cir. 2010) (citing

*Olympic Coast Invest., Inc. v. Wright (In re Wright)*, 364 B.R. 51, 79 (Bankr. D. Mont.

2007)).  (CL, ¶ 38).

Once the plaintiff meets the initial burden of producing evidence to prove the facts

to establish the objection, the burden of proof requiring evidence that will "explain

satisfactorily" the losses or deficiencies shifts to the debtor.  *See, In re Devers*, 759 F.2d

751, 754 (9th Cir. 1985) ("A debtor's failure to offer a satisfactory explanation when

called on by the court is a sufficient ground for denial of discharge under section

727(a)(5).").  *See also, Federal Provision Co. v. Ershowsky*, 94 F.2d 574, 575 (2d Cir.

1938) ("It is [the debtor] who has caused the loss, who has access to the facts, and who

alone knows what the explanation is; let him make it, let him satisfy the court that it really

explains. Else he will not be discharged.").  (CL, ¶ 39).  Courts have held that section

727(a)(5) is broad enough to include any unexplained disappearance or shortage of

assets.  *See, In re Chalik*, *supra*; *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 317

(Bankr. S.D.N.Y. 1994).  (CL, ¶ 40).

### 1.    Defendant Owned Identifiable Assets Prior to the Petition Date

Prior to the Petition Date, the Debtor was in possession of cash assets, in the

form of various bank accounts held in the name of the Debtor's entities, which are shell

companies created solely to hold money for the Debtor.

The Debtor often transferred funds in and out of his entities and into and out of the Debtor's personal accounts in an effort to hide funds from creditors, with no rhyme or reason, and for the Debtor's own personal use – much to the detriment of the Debtor's creditors, including Plaintiff.  During the one year prior to the Petition Date, the Debtor transferred no less than $1,274,000 in Pre-Petition Transfers between and among his entities.  And yet, on the Petition Date, the 2305 Account and the ITM Accounts had less than $72,000 remaining.  No sufficient explanation has been given for the Debtor's concealment of money and the significant loss of money – more than $1.2 million – in the one year pre-petition.

Further, the Debtor also made several withdrawals and/or transfers prior to the Petition Date, between March 2019 and the Petition Date, none of which has been disclosed in the Debtor's Original Schedules or Amended Schedules or been satisfactorily explained with respect to disposition.  Specifically, the bank statements show the following undisclosed and unexplained transfers:

- March 18, 2019: Wire to ETF Management in the sum of $150,000;
- April 19, 2019: Wire to Harris Ritoff in the sum of $100,000;
- May 20, 2019: Two withdrawals in the sum of $28,000 and $7,000, respectively; and
- May 28, 2019: One withdrawal in the sum of $4,000.

Furthermore, prior to the Petition Date, or about May 21, 2019, the Debtor received over $178,750 in insurance proceeds.  Only $126,000 of these funds were deposited into the DIP account following the Petition Date.  Plaintiff's efforts revealed the Insurance Proceeds Transfers, totaling more than $52,000, made by the Debtor within 45 days of the Petition Date.  The Insurance Proceeds Transfers still have not been disclosed by the Debtor in his Schedules, and the Debtor has failed to satisfactorily explain where those proceeds went and for what purpose.

Finally, prior to the Petition Date, the Debtor made the Harris Transfers, totaling $550,000, in February 2019 and the Burr Transfer of $50,000 in May 2019.  These

1    alleged transfers were not disclosed on the Original Schedules and SOFA and were only

2    listed on the Amended Schedules and SOFA *after* their discovery by Plaintiff.  As

3    described above, the Debtor's descriptions of the Harris Transfers and the Burr Transfer

4    are inconsistent, incredible, incomplete and inaccurate.  In short, the Debtor has woefully

5    failed to provide an adequate explanation of the disposition of $600,000 in cash within

6    six months of the Petition Date.

7         Thus, Defendant failed to satisfactorily explain the loss of assets or the deficiency

8    of assets to meet his liabilities.  Accordingly, there is no genuine issue of material fact as

9    to whether Defendant has failed to explain satisfactorily the loss of assets, and summary

10   judgment should be granted under 11 U.S.C. § 727(a)(5).

11                                          **V.**

12                                    **CONCLUSION**

13        For the reasons stated above, Plaintiff respectfully requests that the Court: (1)

14   grant the Motion and enter judgment as a matter of law on Plaintiff's claims under 11

15   U.S.C § 727 on the grounds that there is no "genuine issue" regarding Defendant's

16   fraudulent conduct; and (2) for such further and other relief as the Court may deem just

17   and proper.

18   DATED:  October 7, 2020                      MARGULIES FAITH, LLP

19

20                                       By:    */s/ Craig G. Margulies*
                                              Craig G. Margulies
21                                            Monsi Morales
                                              Attorneys for Plaintiff Darren Kessler

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
16030 Ventura Blvd., Suite 470, Encino, CA 91436

A true and correct copy of the foregoing document entitled **MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT PETER M. SELTZER DENYING DEBTOR'S DISCHARGE UNDER 11 U.S.C. § 727(a)(2)(A), (a)(4)(A), AND (a)(5), OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On October 7, 2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**ATTORNEY FOR DEFENDANT:** Kathleen C Hipps kathleen.hipps@gmlaw.com,
silvia.cerna@gmlaw.com;lorraine.corrales@gmlaw.com
**ATTORNEY FOR PLAINTIFF:** Noreen A Madoyan Noreen@MarguliesFaithLaw.com,
Helen@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com
**ATTORNEY FOR PLAINTIFF:** Craig G Margulies Craig@MarguliesFaithlaw.com,
Vicky@MarguliesFaithlaw.com;Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com
**ATTORNEY FOR PLAINTIFF**: Monserrat Morales    Monsi@MarguliesFaithLaw.com,
Vicky@MarguliesFaithLaw.com;Helen@marguliesfaithlaw.com;Angela@MarguliesFaithlaw.com
**OUST:** United States Trustee (SV) ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On October 7, 2020, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**JUDGE**: Hon. Victoria S. Kaufman, U.S. Bankruptcy Court, 21041 Burbank Blvd., Suite 354, Woodland Hills, CA 91367
**DEFENDANT**: Peter M. Seltzer – 4179 Prado de la Puma, Calabasas, CA 91302

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 7, 2020 | Angela Saba | /s/ Angela Saba |
|---|---|---|
| _Date_ | _Printed Name_ | _Signature_ |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.